UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OLDENDORFF CARRIERS GMBH & CO. KG,<br><br>   **Plaintiff**<br><br>**V.**<br><br>TOTAL PETROCHEMICALS & REFINING USA, INC., TOTAL SPECIALITIES USA, INC., PELICAN ISLAND STORAGE TERMINAL LLC f/k/a PELICAN ISLAND STORAGE TERMINALS, INC. f/k/a GALVESTON TERMINALS, INC. and BUFFALO MARINE SERVICE, INC.,<br><br>   **Defendants.** | § § § § § § § § § § § § § § § | **C.A. NO. 4:14-cv-00129**<br>**Admiralty – Rule 9(h)** |

## DECLARATION OF DIANE CULPEPPER

Diane Culpepper makes the following declaration pursuant to 28 U.S.C. § 1746:

1. My name is Diane Culpepper. I am the Manager, Marine Fuels in the Marketing & Services group at Total Specialities USA, Inc. I am over the age of twenty-one years, have never been convicted of a felony, and am fully competent and authorized to make this declaration. The statements in this declaration are based on my personal knowledge.

1. Attachment 1 is a copy of the complete Total-Unipec contract. The contract attached to Unipec's motion and the Declaration of Oleg Li is incomplete because the ExxonMobil terms and conditions are not attached.

2. The contract referenced above is a Unipec form, not a Total form.

3. The disclaimer of implied warranties in clause 20, if valid, does not affect the express warranty that the RMG 380 fuel oil in question will meet ISO 8217:2010 specifications.



1920753.1/SPH/17604/0121/110614

4.      The inspection referenced in ●leg Li's declaration is neither identified nor attached.  The limited inspection report of which I am aware is Attachment 2.  It did not test for polymers, so it is misleading to state that the "test results did not show any contaminants."   Subsequent, more in depth testing did show presence of those materials.

5.      Total never took possession of the fuel oil.  It was picked up ●y the Buffalo Marine Service barge BUFFALO 301 from a Unipec-leased tank at Pelican Island Terminal in Galveston, Texas and delivered directly to the FLORIANA and the DEPRANOS.

6.      Total's investigation concluded that any contaminants in the fuel oil were present when loaded aboard the BUFFALO 301, and did not come from the barge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November⟋, 2014.

_____
Diane Culpepper

 联合石化美洲有限公司 UNIPEC AMERICA, INC.

| | | |
|---|---|---|
| DATE | : | JANUARY 11, 2012 |
| TO | : | DIANE CULPEPPER/LIZ CONWELL |
| ATTN | : | CONTRACT DEPARTMENT |
| FROM | : | UNIPEC AMERICA INC. |

WE ARE PLEASED TO CONFIRM THIS TRANSACTION BETWEEN YOUR COMPANY AND UNIPEC AMERICA INC. PLEASE NOTE THAT ALL CONTRACTUAL CORRESPDNDENCES BEWTEEN OUR COMPANIES MUST BE DIRECTED TO THE FOLLOWING UNIPEC AMERICA INC FULLSTYLE AS BELOW. UNIPEC AMERICA INC WILL NOT BE HELD RESPONSIBLE FOR DELAYS RESULTING FROM CORRESPONDENCE SENT TO ANY OTHER PLACES.

OUR CONTRACT REF     : 2013UPUS003FOS          TRADE DATE: JANUARY 10

1. **SELLER**
   TRADER: MARK VANDEVOORDE
   UNIPEC AMERICA, INC.
   410 PARK AVENUE, SUITE 610
   NEW YORK, NY 10022

2. **BUYER**
   TRADER: DIANE CULPEPPER
   TOTAL PETROCHEMICALS&REFINING USA, INC

3. **PRODUCT**
   FUEL OIL (RMG 380)

4. **QUANTITY**
   10,000-13,000 BBLS, 10% AT BUYER'S OPTION

5. **QUALITY**
   MEETING RMG-380 SPECIFICATIONS IN ACCORDANCE WITH ISO 8217:2010

6. **TITLE TRANSFER LOCATION**
   GTI PELICAN ISLAND STORAGE FACILITY, IN GALVESTON, TEXAS

7. **DELIVERY TERMS**
   FOB

8. **DELIVERY METHOD**
   BARGE NOMINATED BY BUYER

9. **DELIVERY TIMING**
   13-15 DEC 2013

10. **PRICE/PRICING LOCATION**
    PLATT'S U.S. GULF COAST WATERBORNE MEAN FOR NO. 6 FUEL OIL 3.0 PCT SULPHUR PLUS U.S. DLRS. 2.00 PER BARREL.
    ROUNDING CONVENTIONS SHALL BE AS FOLLOWS:
    COMMODITIES PRICING IN BARRELS SHALL BE ROUNDED TO THE NEAREST THIRD DECIMAL PLACE,

1

 联合石化美洲有限公司 UNIPEC AMERICA, INC.

**11. PRICING PERIOD**

JANUARY 11-14, 2013

**12. TITLE AND RISK OF LOSS**

DELIVERY SHALL BE DEEMED COMPLETE AND TITLE AND RISK OF LOSS SHALL PASS FROM SELLER TO BUYER AS PRODUCT PASSES FROM THE LAST FLANGE CONNECTING THE DELIVERING FACILITIES EQUIPMENT TO THE RECEIVING FACILITY'S EQUIPMENT OR IN THE CASE OF VESSEL DELIVERIES AS PRODUCT PASSES THE VESSEL'S PERMANENT MANIFOLD FLANGE AT THE LOAD PORT. ANY LOSS OR DAMAGE TO PRODUCT DURING LOADING, IF CAUSED BY THE VESSEL OR HER OFFICERS OR CREW, SHALL BE FOR THE ACCOUNT OF BUYER. ANY LOSS OR DAMAGE TO ANY PROPERTY OF SELLER, SELLER'S SUPPLIER OR TERMINAL OPERATOR, OR ANY OIL POLLUTION CAUSED BY THE VESSEL OR HER OFFICERS OR CREW, SHALL BE ALLOCATED ACCORDING TO FAULT OR ACCORDING TO LIABILITY AS IMPOSED BY REGULATION.

**13. PUBLIC DOCK CLAUSE**

IF THE LOADING PORT/TERMINAL IS A PUBLIC TERMINAL OR DOCK, OVER WHICH THE BUYER AND SELLER HAVE NO CONTROL, LAYTIME SHALL NOT COMMENCE UNTIL THE BARGE IS ALL FAST AT THE DESIGNATED DOCK

**14. QUANTITY AND QUALITY MEASUREMENT**

QUANTIY TO BE NET BARRELS (42 UNITED STATES GALLONS) MEASURED AT A TEMPERATURE OF 60 DEGREES FAHRENHEIT AND AN ABSOLUTE PRESSURE OF 29.92 INCHES OF MERCURY , IN ACCORDANCE WITH ASTM D-1250, TABLE 6B, IN ITS LATEST REVISION.

QUANTITY FOR INVOICING PURPOSES SHALL BE SHORE TANK DOWN GAUGE MESUREMENT AS EVIDENCED BY INDEPENDENT INSPECTOR REPORT, PERFORMED BY MUTUALLY AGREED INDEPENDENT INSPECTOR.

QUALITY IS TO BE BASED BARGE COMPOSITE SAMPLES AFTER LOADING, AS EVIDENCED BY INSPECTION REPORT FROM MUTUALLY AGREED UPON INDEPDENENT INSPECTOR.

INSPECTION SHALL BE CARRIED OUT BY A MUTUALLY ACCEPTABLE INDEPENDENT INSPECTION COMPANY WHOSE FINDINGS, SAVE FRAUD OR MANIFEST ERROR, SHALL BE FINAL AND BINDING ON THE PARTIES. COST OF INSPECTION IS TO BE SHARED EQUALLY BETWEEN BUYER AND SELLER.  WHEN PERMITTED BY FACILITY OPERATOR, BUYER MAY ALSO, AT ITS EXPENSE, APPOINT A REPRESENTATIVE TO WITNESS QUALITY AND QUANTITY DETERMINATIONS.

**15. PAYMENT TERMS**

FINAL PAYMENT SHALL BE MADE BY BUYER THREE (3) BUSINESS DAYS AFTER RECEIPT OF SELLERS' FINAL INVOICE AND SUPPORTING DOCUMENTATION, VIA WIRE TRANSFER IN FEDERAL FUNDS TO SELLER'S BANK.  BUSINESS DAYS ARE DEFINED AS ANY DAY ON WHICH THE FEDERAL RESERVE IS OPEN FOR BUSINESS IN NEW YORK, NEW YORK.

**16. CREDIT**

OPEN CREDIT

**17. INSPECTION**

 联合石化美洲有限公司 UNIPEC AMERICA, INC.

MUTUALLY AGREED INDEPENDENT INSPECTOR. COST TO BE SHARED EQUALLY BETWEEN BUYER AND SELLER. INSPECTORS RESULTS TO BE FINAL AND BINDING. QUALITY WILL BE DETERMINED BY BARGE COMPOSITE.

**18. SELLERS WARRANTY OF TITLE**

SELLER'S WARRANTY OF TITLE: SELLER HEREBY EXPRESSLY WARRANTS THAT IT HAS MARKETABLE TITLE FREE AND CLEAR OF ANY LIENS OR ENCUMBRANCES TO PRODUCT SOLD AND DELIVERED HEREUNDER, AND THAT SELLER HAS FULL RIGHT AND AUTHORITY TO TRANSFER SUCH TITLE AND EFFECT DELIVERY OF SUCH PRODUCT TO BUYER.

**19. LIABILITY**

NEITHER THE SELLER NOR THE BUYER SHALL BE LIABLE FOR CONSEQUENTIAL, INDIRECT OR SPECIAL LOSSES OR SPECIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PERFORMANCE OF OR FAILURE TO PERFORM THIS CONTRACT. THE SELLER SHALL IN NO CIRCUMSTANCES BE LIABLE FOR MORE THAN THE DIFFERENCE BETWEEN THE CONTRACT PRICE AND THE MARKET PRICE, BASED ON THE NEAREST AVAILABLE MARKET, AT THE DATE OF ANY BREACH OF THE CONTRACT.

THE TWO PARTY AGREE THAT NEITHER IT NOR ANY OF ITS REPRESENTATIVES, OR AFFILIATES, IN CONNECTION WITH THIS CONTRACT AND THE ACTIVITIES CONTEMPLATED THEREIN, WILL OFFER, PROMISE OR GIVE, DIRECTLY OR INDIRECTLY, ANYTHING OF VALUE TO THE OTHER PARTY, AFFILIATE OF THE OTHER PARTY, THE EMPLOYEE OF THE OTHER PARTY OR ITS AFFILIATE, ANY GOVERNMENT OFFICIAL, POLITICAL PARTY OFFICIAL, SO AS TO OBTAIN SUPERFLUITY BENEFIT FROM THE OTHER PARTY. IF ANY PARTY BREAKS THE RULE, IT WILL PAY FOR LOSS OF THE OTHER PARTY.

**20. WARRANTIES**

EXCEPT FOR WARRANTY OF TITLE, NO CONDITIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR SUITABILITY OF THE OIL FOR ANY PARTICULAR PURPOSE OR OTHERWISE, ARE MADE BY SELLER OTHER THAN THAT THE OIL CONFORMS, WITHIN ANY TOLERANCES STATED AND TO THE EXTENT OF REPRODUCIBILITY AND REPEATABILITY OF THE TEST METHOD USED, TO THE DESCRIPTION CONTAINED HEREIN.

**21. TAXES**

THE PRICE PROVIDED HEREIN IS EXCLUSIVE OF ANY GST, DUTIES, FEES, WITHHOLDING TAXES ON FREIGHT AND ALL OTHER TAXES, GOVERNMENT LEVIES, EXPORT DUTIES, COSTS OR PAYMENTS OF

WHATSOEVER NATURE ATTACHING TO THE PRODUCTS AFTER THE PRODUCTS PASSES THE VESSEL'S PERMANENT FLANGE CONNECTION AT LOADING PORT AND AT DISCHARGING PORT AND, INCLUDING INTEREST AND PENALTIES LEVIED AS A CONSEQUENCE OF NON-PAYMENT OF ANY OF THE FOREGOING AND ALL OTHER CHARGES ON THE CARGOES, OR ITS ASSIGNEE, ALL OF WHICH ARE FOR THE ACCOUNT OF AND SHALL BE PAID BY THE BUYER.

**22. FORCE MAJEURE**

IF BY REASON OF "FORCE MAJEURE" EITHER PARTY HERETO IS DELAYED OR HINDERED OR PREVENTED FROM COMPLYING WITH ITS OBLIGATIONS UNDER THIS CONTRACT OTHER THAN OBLIGATIONS TO MAKE PAYMENT AND PROVISIONS OF SECURITY, THE AFFECTED PARTY WILL IMMEDIATELY GIVE NOTICE TO THE OTHER WITHIN FORTY EIGHT (48) HOURS AFTER RECEIVING NOTICE THEREOF STATING: THE NATURE OF THE "FORCE MAJEURE" EVENT, ITS EFFECT ON THE

 联合石化美洲有限公司 UNIPEC AMERICA, INC.

OBLIGATIONS OF THE PARTY GIVING THE NOTICE, AND THE ESTIMATED DATE THE CONTINGENCY IS EXPECTED TO BE REMOVED. TO THE EXTENT THAT THE AFFECTED PARTY IS OR HAS BEEN DELAYED OR HINDERED OR PREVENTED BY A "FORCE MAJEURE" EVENT FROM COMPLYING WITH ITS OBLIGATIONS UNDER THIS CONTRACT, THE AFFECTED PARTY MAY SUSPEND THE PERFORMANCE OF ITS OBLIGATIONS UNTIL THE CONTINGENCY IS REMOVED.

IF THE "FORCE MAJEURE" EVENT CANNOT BE RECTIFIED OR CURED WITH THIRTY (30) DAYS, OR A "FORCE MAJEURE" EVENT RESULTS IN A DELAY EXTENDING BEYOND THIRTY (30) DAYS, EITHER PARTY MAY TERMINATE THIS CONTRACT UPON WRITTEN NOTICE AND BOTH PARTIES WILL BE RELIEVED OF THEIR FURTHER CONTRACTUAL OBLIGATIONS, EXCEPT FOR THEIR ACCRUED RIGHTS AND OBLIGATIONS WHICH SHALL SURVIVE THE TERMINATION OF THIS CONTRACT IN ACCORDANCE WITH THIS PROVISION. NOTWITHSTANDING THIS CLAUSE, NEITHER PARTY SHALL BE RELIEVED OF MAKING PAYMENT IN FULL AND IN ACCORDANCE WITH THIS CONTRACT OF ANY SUMS THAT HAVE ACCRUED DUE UNDER THIS CONTRACT PRIOR TO ITS TERMINATION INCLUDING BUT NOT LIMITED TO THE PRICE AND DEMURRAGE.

FOR THE PURPOSE OF THIS CLAUSE, "FORCE MAJEURE" MEANS AN EVENT OR OCCURRENCE OR CIRCUMSTANCE BEYOND THE REASONABLE CONTROL OF THE AFFECTED PARTY, INCLUDING BUT WITHOUT PREJUDICE TO THE GENERALITY OF THE FOREGOING, FAILURE OR DELAY CAUSED BY OR RESULTING FROM ANY CURTAILMENT, FAILURE OR CESSATION OF SUPPLIES OF THE OIL FROM ANY OF THE SELLER'S OR SUPPLIERS' SOURCES OF SUPPLY OR ANY REFUSAL TO SUPPLY OIL (WHETHER LAWFUL OR OTHERWISE BY SELLER'S SUPPLIER(S) AND WHETHER OR NOT FOR THE PURPOSE OF THIS CONTRACT), ACTS OF GOD, FIRES, WARS (WHETHER DECLARED OR UNDECLARED), BLOCKADES, INSURRECTIONS, RIOTS, SABOTAGE, ACT OF PUBLIC ENEMIES, EPIDEMICS, DESTRUCTION OF THE PRODUCT, PERILS OF THE SEA, EARTHQUAKES, FLOODS, ICE CONDITION, STRIKES, LOCKOUTS OR OTHER LABOUR DISRUPTIONS, ACCIDENTS, EXPLOSIONS, BREAKDOWNS OR FAILURE OF WELLS, PIPE, STORAGE TANKS, REFINERY FACILITIES, PLANT, MACHINERY OR EQUIPMENT, OFFICIAL EMBARGOES, ACTIONS OR RESTRICTIONS IMPOSED BY ANY GOVERNMENT AUTHORITY OR PERSON PURPORTING TO ACT THEREFOR (INCLUDING ALLOCATIONS, PRIORITIES, REQUISITIONS, QUOTAS AND PRICE CONTROLS), OR OTHER CAUSE NOT REASONABLY WITHIN THE CONTROL OF THE RESPECTIVE PARTIES. FOR THE AVOIDANCE OF DOUBT, A LACK OF FUNDS, THE AVAILABILITY OF A MORE ATTRACTIVE MARKET, OR INEFFICIENCIES IN OPERATIONS DO NOT CONSTITUTE EVENTS OF "FORCE MAJEURE".

**23. GOVERNING LAWS AND ARBITRATION**
THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE NEW YORK WITHOUT REFERENCE TO ITS LAW ON CONFLICTS AND THE PARTIES HEREBY SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE NEW YORK COURTS SITUATED IN NEW YORK CITY, BOROUGH OF MANHATTAN, AND TO SERVICE OF PROCESS BY CERTIFIED MAIL.

THE PARTIES WILL ATTEMPT IN GOOD FAITH TO RESOLVE ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS CONTRACT PROMPTLY BY NEGOTIATIONS. IF A CONTROVERSY OR CLAIM SHOULD ARISE, THE REPRESENTATIVES OF THE PARTIES WHO NEGOTIATED THE SAME, OR THEIR RESPECTIVE SUCCESSORS ("PRINCIPAL CONTACTS"), WILL MEET AT LEAST ONCE AND WILL ATTEMPT TO RESOLVE THE MATTER. EITHER PRINCIPAL CONTACT MAY REQUEST THAT THE OTHER MEET WITHIN 14 DAYS, AT A MUTUALLY AGREED TIME. IF THE MATTER HAS NOT BEEN RESOLVED WITHIN 20 DAYS OF THEIR FIRST MEETING, THE PRINCIPAL CONTACTS SHALL REFER THE MATTER TO SENIOR EXECUTIVES OF THEIR RESPECTIVE COMPANIES WHO SHALL HAVE AUTHORITY TO SETTLE THE DISPUTE (HEREIN CALLED "THE SENIOR EXECUTIVES"). THEREUPON, THE PRINCIPAL CONTACTS SHALL PROMPTLY PREPARE AND EXCHANGE MEMORANDA STATING THE ISSUES IN DISPUTE AND THEIR POSITIONS,

4

联合石化美洲有限公司 UNIPEC AMERICA, INC.

SUMMARIZING THE NEGOTIATIONS WHICH HAVE TAKEN PLACE, AND ATTACHING RELEVANT DOCUMENTS. THE SENIOR EXECUTIVES WILL MEET FOR NEGOTIATIONS WITHIN 14 DAYS OF THE END OF THE 21-DAY PERIOD REFERRED TO ABOVE, AT A MUTUALLY AGREED TIME. THE FIRST MEETING SHALL BE HELD AT THE OFFICES OF THE PRINCIPAL CONTACT RECEIVING THE REQUEST TO MEET. IF MORE THAN ONE MEETING IS HELD, THE MEETINGS SHALL BE HELD IN ROTATION AT THE OFFICES OF EACH COMPANY. IF THE MATTER HAS NOT BEEN RESOLVED WITHIN 30 DAYS OF THE MEETING OF THE SENIOR EXECUTIVES (WHICH PERIOD MAY BE EXTENDED BY MUTUAL AGREEMENT), THE PARTIES WILL ATTEMPT IN GOOD FAITH TO RESOLVE THE CONTROVERSY OR CLAIM IN ACCORDANCE WITH THE CENTER FOR PUBLIC RESOURCES MODEL PROCEDURE FOR MEDIATION OF BUSINESS DISPUTES.

IF THE MATTER HAS NOT BEEN RESOLVED PURSUANT TO THE AFORESAID MEDIATION PROCEDURE WITHIN 60 DAYS OF THE COMMENCEMENT OF SUCH PROCEDURE (WHICH PERIOD MAY BE EXTENDED BY MUTUAL AGREEMENT), THE CONTROVERSY SHALL BE SETTLED BY BINDING FINAL ARBITRATION IN ACCORDANCE WITH THE CENTER FOR PUBLIC RESOURCES RULES FOR NON-ADMINISTERED ARBITRATION OF BUSINESS DISPUTES, BY A SOLE ARBITRATOR. THE ARBITRATION SUPERCEDES SHALL BE GOVERNED BY THE UNITED STATES ARBITRATION ACT, 9 U.S.C. 1-16, AND JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED BY ANY COURT HAVING JURISDICTION THEREOF. THE PLACE OF ARBITRATION SHALL BE NEW YORK CITY, NEW YORK

**24. THIRD PARTY RIGHTS**

NOTHING IN THIS AGREEMENT SHALL BE CONSIDERED OR CONSTRUED AS CONFERRING ANY RIGHT OR BENEFIT ON A PERSON NOT A PARTY TO THIS AGREEMENT AND THE PARTIES DO NOT INTEND THAT ANY TERM OF THIS AGREEMENT SHOULD BE ENFORCEABLE, BY VIRTUE OF THE CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999, BY ANY PERSON WHO IS NOT A PARTY TO THIS AGREEMENT.

**25. ASSIGNMENT**

WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD, NEITHER PARTY MAY ASSIGN ITS RIGHTS OR OBLIGATIONS UNDER THIS CONTRACT IN FULL OR IN PART, EXCEPT FOR AN ASSIGNMENT BY SELLER FOR FINANCING PURPOSES OF RIGHTS IN RESPECT OF THE WHOLE OR PART OF THE PROCEEDS OF SALE UNDER THE CONTRACT OR AN ASSIGNMENT BY SELLER TO AN AFFILIATE OR RELATED CORPORATION. ANY SUCH ASSIGNMENT WILL NOT DETRACT FROM SELLER'S OBLIGATIONS UNDER THIS CONTRACT.

**26. ISPS COMPLIANCE**

I) BUYERS SHALL PROCURE THAT THE VESSEL SHALL COMPLY WITH THE REQUIREMENTS OF THE INTERNATIONAL SHIP AND PORT FACILITY SECURITY CODE AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) AND WHERE THE LOADING PORT IS WITHIN THE USA AND US TERRITORIES OR WATERS, WITH THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA).

II) THE VESSEL SHALL WHEN REQUIRED SUBMIT A DECLARATION OF SECURITY (DOS) TO THE APPROPRIATE AUTHORITIES PRIOR TO ARRIVAL AT THE LOADING PORT.

III) NOTWITHSTANDING ANY PRIOR ACCEPTANCE OF VESSEL BY SELLER, IF AT ANY TIME PRIOR TO THE PASSING OF RISK AND TITLE THE VESSEL CEASES TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR MTSA:

A) SELLER SHALL HAVE THE RIGHT NOT TO BERTH SUCH NOMINATED VESSEL AND ANY DEMURRAGE RESULTING SHALL NOT BE FOR THE ACCOUNT OF THE SELLER.

B) BUYER SHALL BE OBLIGED TO SUBSTITUTE SUCH NOMINATED VESSEL WITH A VESSEL COMPLYING WITH THE REQUIREMENTS OF THE ISPS CODE AND MTSA.

5

 联合石化美洲有限公司 UNIPEC AMERICA, INC.

IV)

A) SELLERS SHALL PROCURE THAT THE LOADING PORT/TERMINAL/ INSTALLATION SHALL COMPLY WITH THE REQUIREMENTS OF THE INTERNATIONAL SHIP AND PORT FACILITY SECURITY CODE AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) AND IF LOCATED WITHIN THE USA AND US TERRITORIES, WITH THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA)

B) ANY COSTS OR EXPENSES IN RESPECT OF THE VESSEL INCLUDING DEMURRAGE OR ANY ADDITIONAL CHARGE, FEE OR DUTY LEVIED ON THE VESSEL AT THE LOADING PORT AND ACTUALLY INCURRED BY BUYER RESULTING DIRECTLY FROM THE FAILURE OF THE LOADING PORT/ TERMINAL/INSTALLATION TO COMPLY WITH THE ISPS CODE AND IF LOCATED WITHIN THE USA AND US TERRITORIES, WITH THE MTSA, SHALL BE FOR THE ACCOUNT OF THE SELLER, INCLUDING BUT NOT LIMITED TO THE TIME REQUIRED OR COSTS INCURRED BY THE VESSEL IN TAKING ANY ACTION OR ANY SPECIAL OR ADDITIONAL SECURITY MEASURES REQUIRED BY THE ISPS CODE OR MTSA

V) SAVE WHERE THE VESSEL HAS FAILED TO COMPLY WITH THE REQUIREMENTS OF THE INTERNATIONAL SHIP AND PORT FACILITY SECURITY CODE AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) AND WITHIN THE USA AND US TERRITORIES OR WATERS, WITH THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA), THE SELLER SHALL BE RESPONSIBLE FOR ANY DEMURRAGE ACTUALLY INCURRED BY THE BUYER ARISING FROM DELAY TO THE VESSEL AT THE LOADING PORT RESULTING DIRECTLY FROM THE VESSEL BEING REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY TO TAKE ANY ACTION OR ANY SPECIAL OR ADDITIONAL SECURITY MEASURES OR UNDERGO ADDITIONAL INSPECTIONS BY VIRTUE OF THE VESSEL'S PREVIOUS PORTS OF CALL.

VI) THE SELLER'S LIABILITY TO THE BUYER UNDER THIS CONTRACT FOR ANY COSTS, LOSSES OR EXPENSES INCURRED BY THE VESSEL, THE CHARTERERS OR THE VESSELOWNERS RESULTING FROM THE FAILURE OF THE LOADING PORT / TERMINAL / INSTALLATION TO COMPLY WITH THE ISPS CODE OR MTSA SHALL BE LIMITED TO THE PAYMENT OF DEMURRAGE AND COSTS ACTUALLY INCURRED BY THE BUYER IN ACCORDANCE WITH THE PROVISIONS OF THIS CLAUSE.

**27. OTHER TERMS AND CONDITIONS**
ALL OTHER TERMS AND CONDITIONS WHERE NOT IN CONFLICT WITH THE ABOVE, SHALL BE AS PER *EXXONMOBIL GENERAL TERMS AND CONDITIONS.*

**28. MARINE PROVISIONS**
ALL MARINE PROVISIONS WHERE NOT IN CONFLICT WITH THE ABOVE, SHALL BE AS PER *EXXONMOBIL MARINE PROVISIONS.*

THIS DEAL IS TO BE KEPT PRIVATE AND CONFIDENTIAL.

THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT OF THE PARTIES AND THERE ARE NO ORAL PROMISES, REPRESENTATIONS OR WARRANTIES AFFECTING IT.

UNIPEC CONTACTS FOR THIS CONTRACT SHALL BE AS FOLLOWS

COMMERCIAL CONTACT:
PIC          : MARK VANDEVOORDE
DID          : + 1 646.454.5222

 联合石化美洲有限公司 UNIPEC AMERICA, INC.

EMAIL            : MARKV@UNIPECAM.COM

OPERATIONS CONTACT:
PIC              : ADA LI/ROGER LUO
DID              : +1 646 454 5233/34
MB               : +1 646 770 6533/+1 646 651 8818
EMAIL            : OPSPRODUCTS@UNIPECAM.COM

FINANCIAL CONTACTS:
PIC              : MICHAEL LAW
TEL              : +1-212-759-5085 ext.337
EMAIL            : FINANCE@UNIPECAM.COM

DEMURRAGE CONTACT:
PIC              : ADA LI /ROGER LUO
TEL              : +1 646 454 5233 /+1 646 651 8818
EMAIL            : OPSPRODUCTS@UNIPECAM.COM

BEST REGARDS,

UNIPEC AMERICA INC.

Add: 410 Park Avenue, 6th Floor, Suite 610, New York, NY 10022 USA
Tel:  +1 212 759 5085    Fax:  +1 212 991 5609

**EXXONMOBIL SALES AND SUPPLY CORPORATION**
**GENERAL TERMS AND CONDITIONS**
**FOR FOB PURCHASES AND SALES OF PETROLEUM PRODUCT IN BULK IN VESSELS**

## Introduction

These General Terms are designed for use in transactions in which ExxonMobil Sales and Supply Corporation or any of its Affiliates is either the Seller or the Buyer of Product in bulk in vessels on a FOB basis. These General Terms shall be appended to or incorporated by reference in the Special Terms. To the extent that these General Terms contradict the Special Terms or are inconsistent with them, the Special Terms shall prevail. References herein to the "Contract" shall mean the Special Terms and these General Terms.

## Article 1 – Definitions

As used herein the following terms shall have the meanings respectively assigned to them:

(a)     "Accepted Date Range" means a period specified within the Special Terms within which the vessel shall tender Notice of Readiness (or NOR) at a Loading Port, as accepted, agreed, or established pursuant to Article 7(f).

(b)     "Affiliate" means any company, partnership, joint venture, or entity controlled by, controlling or under common control with a Party hereto. For the purposes of this definition, "control" means the direct or indirect beneficial ownership of fifty percent (50%) or more of the stock entitled to vote in the election of directors or, if there is no such stock, fifty percent (50%) or more of the owners' interest in such company, partnership, joint venture, or entity.

(c)     "Dollar" means the currency of the United States of America.

(d)     "FOB" means Product delivered Free On Board, as defined in the latest edition of Incoterms.

(e)     "LIBOR" means, as of any date of determination, the three (3) month London Interbank Offered rate for Dollars, determined at 11:00 a.m., London time, on the first day of the calendar quarter in which the date of determination occurs (or, if the first day of such calendar quarter is not a London Banking Day, the immediately preceding London Banking Day), as such rate is published by the British Bankers Association. If the British Bankers Association ceases to publish the three (3) month London Interbank Offered rate for Dollars, the Parties shall designate an alternative mechanism consistent with Eurodollar market practices for determining such rate. For purposes of this definition, a "London Banking Day" is a day on which dealings in deposits in Dollars are transacted on the London Interbank market.

(f)     "Loading Port" means any berth, dock, anchorage, sea terminal, submarine line, alongside vessel and/or lighter, whether at anchor or underway, and/or any other place at which Product is to be loaded for shipment, agreed to by the Parties.

(g)     "Loading Terminal" means the delivery facilities for Product at a Loading Port.

(h)     "Party" means either the Buyer or the Seller, and jointly they may be referred to herein as the "Parties".

(i)     "P&I Club" means the applicable Protection and Indemnity Club.

(j)     "Product" means the petroleum product described in the Special Terms for sale and purchase hereunder.

(k)     "Special Terms" means the additional terms and any amendments to these General Terms as mutually agreed

May 5, 2006

by the Parties.

(l)      "Terminal Procedures" means all procedures established or customarily practiced by the operator of a Loading Terminal with respect to notifications, nominations, berthing, scheduling, vessel acceptance, documentation, departure, measurement, and other health, safety, environmental and operational matters.

## Article 2 – Quality and Disclaimer of Warranties

The quality of each grade of Product, except as otherwise provided in the Special Terms, shall be the export quality of that grade being made available by the Seller at the time of loading of the Product at the Loading Terminal. **THERE ARE NO GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE DESCRIPTION OR SATISFACTORY QUALITY OF THE PRODUCT, FITNESS OR SUITABILITY OF THE PRODUCT FOR ANY PARTICULAR PURPOSE OR OTHERWISE, THAT EXTEND BEYOND THE DESCRIPTION AND SPECIFICATIONS OF THE PRODUCT CONTAINED IN THE SPECIAL TERMS.**

## Article 3 – Verification and Measurement

(a)      Subject to the provisions of this Article 3, the determination of the quantity and quality of each shipment of Product shall be at the Loading Terminal. Where Terminal Procedures permit, the standards and practices governing these determinations, as specified in Appendix 1, shall be used, failing which, the determination of the quantity and quality of each shipment of Product shall be in accordance with Terminal Procedures.

(b)      The Parties shall appoint a mutually-acceptable, recognized, independent petroleum inspector ("Inspector"), who will be permitted access to the facilities where quantity and quality are to be determined, to measure, test, or witness and certify the quantity and quality of Product in accordance with Appendix 1 and consistent with Terminal Procedures.

        (1)      The Buyer and the Seller shall equally share all reasonable charges rendered by the Inspector.

        (2)      On completion of verification and measurement of the Product, the Seller shall instruct the Inspector to (i) prepare and sign certificates stating the quantity and quality determined for the Product, (ii) furnish the Buyer and the Seller each with a copy of such certificates, and (iii) expeditiously advise in writing to the Buyer and the Seller the determined quantity and quality. The data in the certificates of quantity and quality shall, absent fraud or manifest error, be used for the invoice and the Bill of Lading, subject to the Seller or the Buyer reserving the right to bring a claim in respect of quantity and/or quality in accordance with procedures described in Article 3(d).

        (3)      If an Inspector fails to appear or is unable to perform his duties, delivery of Product shall proceed and the Seller shall instruct the Loading Terminal to perform the duties described in Article 3(b) and 3(e). The Loading Terminal shall issue certificates subject to the Seller or the Buyer reserving the right to bring a claim in respect of quantity and/or quality in accordance with procedures described in Article 3(d).

(c)      If, no later than fifteen (15) days after the Bill of Lading Date, Seller requests a Certificate of Discharge for the Product purchased under this Contract, the Buyer shall provide the Seller with such Certificate. The Certificate of Discharge shall be prepared on headed stationery by the vessel's agents at the discharge port and attested by an official seal and signature of the customs authorities or local Chamber of Commerce. The Certificate shall reach the Seller within four (4) months of the Bill of Lading date. The Certificate should include the names of the Loading and Discharge Ports, the dates of loading and discharge, the grades and volumes involved, the vessel name, details of lightering or ship-to-ship transfer if applicable, and the names

of both the agents at the Discharge Port and the consignee.  In the event that any specific detail is not available, the Buyer shall provide separate advice to cover such omission.

(d)     Any claim by the Buyer regarding the quantity or quality of Product shall be deemed waived unless a notice of the existence of a potential claim is made in writing to the Seller no later than sixty (60) days following the Bill of Lading date.  All of the Buyer's supporting documents must be forwarded to the Seller within sixty (60) days of the notice of claim, or such claim shall be deemed waived.

(e)     If the quality claim is made within the required time bar, then both parties will mutually agree on an independent inspector and lab to test retained load port samples.  Any such testing of retained samples for the purpose of establishing conformity with specification must be performed according to protocols set forth in ASTM D3244. The results of such test will be the final determination of the quality and be final and binding on both Parties.

**Article 4 – Title and Risk**

Delivery shall be deemed completed and title and risk shall pass at the Loading Terminal as the Product passes the flange connection between the delivery hose and the intake manifold of the Buyer's vessel, at which point the Seller's responsibility shall cease and the Buyer shall assume all risk of loss, damage, deterioration, or evaporation as to Product so delivered.  It is expressly understood that the passage of title and risk is not conditional on delivery of Bills of Lading.

Any loss of or damage to the Product or to any property of the Seller or terminal operator and the consequences of oil pollution of sea water before, during or after loading, that is caused through the fault of the Buyer's vessel, as between the Parties hereto, shall be for the Buyer's account.

**Article 5 – Payment**

(a)     The Buyer shall pay for each delivery of Product at the price set out in the Special Terms, without deduction, discount, set off or counter claim. Payment shall be made by bank wire transfer in immediately available Dollar funds to a bank account designated by the Seller.  Payment is due not later than thirty (30) days from the date of the Bill of Lading of each shipment, with the Bill of Lading date being "day zero".  If the payment due date is on a Saturday or New York bank holiday other than a Monday, payment shall be due on the preceding New York banking day.  If the payment due date is on a Sunday or a Monday New York bank holiday, payment shall be due on the next succeeding New York banking day.

Payment for the Product on the basis of quantity and quality determined under Article 3 shall be made in full against presentation of a commercial invoice and full set of clean original Bills of Lading or the Seller's letter of indemnity.  The Seller shall deliver the commercial invoice and full set of clean, original Bills of Lading (or the Seller's letter of indemnity in a form acceptable to Buyer in lieu of Bills of Lading) to the Buyer at least three (3) business days before the payment falls due.

   (1)    Invoices may be provided by facsimile, or other non-electronic written communication.

   (2)    The Buyer may not delay payment because of the Seller's failure or delay to tender to the Buyer, or its designee, Bills of Lading or other shipping documentation required in the Special Terms.  In the absence of Bills of Lading or any such other required documentation, the Seller shall provide the Buyer with Seller's written Letter of Indemnity (via telex, facsimile, electronic mail or other written communication).  This indemnity shall remain in effect until the shorter of thirty-six (36) months or such time as the Bills of Lading or such other required documentation are presented to the Buyer.

(b)     If the Buyer fails to make payment when due, the Seller shall have the right to charge interest on any amount

overdue at a rate equal to LIBOR plus two percent (2%) per annum, but no higher than the maximum rate which may legally be imposed in the circumstances and in the relevant period. This interest shall be calculated on the basis of a three hundred sixty (360) day year.

(c)     If the Seller, in its reasonable opinion, determines that the financial responsibility of the Buyer or its guarantor (if applicable) has become impaired, or that financial assurances are necessary, then the Seller may require:

  (1)     cash payment in advance; or

  (2)     security in a form and amount acceptable to the Seller, including a standby letter of credit issued by a bank acceptable to the Seller;

Failure by the Buyer to provide security within the time frame specified in the Seller's notice requesting financial assurances shall be grounds for the Seller to terminate this Contract with immediate effect on written notice to the Buyer or suspend delivery (immediately upon written notice) until acceptable financial assurances are put in place. All liabilities, costs and expenses incurred by reason of the Seller's request for acceptable financial assurances in accordance with this Article shall be solely for the Buyer's account.

## Article 6 – Taxes, Duties and Imposts

(a)     Seller shall be liable for all taxes, duties and other such charges applicable to the Product sold hereunder upstream of the delivery point. Subject to Article 6(b) the Buyer shall be liable for all taxes, duties and other such charges applicable to the sale and/or delivery of Product hereunder at or downstream of the delivery point including dues and other charges on the vessel and any taxes on freight. The delivery point shall be as provided for in Article 4.

(b)     The Seller shall be the exporter of record and shall be responsible for obtaining all export permits or similar approvals required for the export of the Product from the country of the Loading Terminal, and for any export duties or customs fees in connection therewith.

## Article 7 – Delivery and Nomination

(a)     Delivery of Product shall be made FOB by the Seller to the Buyer in bulk into vessel(s) arranged by the Buyer.

(b)     The vessel(s) nominated by the Buyer to take delivery of the Product shall be subject to the Seller's prior written approval. Upon the Buyer's nomination, Seller shall submit the nomination for the Loading Terminal's acceptance and communicate the Loading Terminal's acceptance or rejection of the nominated vessel to the Buyer. With respect to any vessel nominated by Buyer to take delivery of Product under this Agreement Buyer makes the following representations and warranties:

  (1)     The owners of the vessel used to take delivery of such Product shall have a policy on Drug and Alcohol Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines for the Control of Drugs and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy must be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations. The Buyer further warrants that the Policy will remain in effect during the term of this Contract and that the Buyer shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Buyer has

May 5, 2006                                          4

failed to exercise due diligence. Upon Seller's request, Buyer shall provide Seller with a copy of the Policy applicable to the vessel. Absence of a Policy, or failure to deliver a copy of the Policy within a reasonable time after Seller's request is grounds for Seller to reject or withdraw acceptance of the vessel.

(2)   The vessel used to take delivery of such Product shall have full and valid protection and indemnity insurance ("P&I insurance") placed with a P&I Club which is a member of the International Group of P&I Clubs. The P&I insurance must include full coverage against liability for cargo loss and/or damage and coverage against pollution liability for the maximum scope and amount available under the Rules of the relevant P&I Club.

(3)   The vessel shall be owned by or demise chartered to a member of the International Tanker Owners Pollution Federation ("ITOPF").

(4)   The vessel shall be fully compliant with the International Safety Management ("ISM") code and the Buyer, if requested, shall provide the Seller with a copy of the appropriate ISM documentation.

(5)   The vessel shall have on board all certificates of financial responsibility in respect of oil pollution necessary for the required voyage, including but not limited to (i) the certificate of insurance required under the International Convention on Civil Liability for Oil Pollution Damage, and (ii) certificates of financial responsibility meeting the requirements of United States federal and/or relevant state authorities.

(6)   In the event that the International Ship and Port Facility Security (ISPS) Code and/or the US Maritime Transportation Security Act of 2002 (either collectively or individually referred to as the "Security Regulations") are in effect at the Loading Port, the vessel shall be in full compliance with the applicable Security Regulations in effect at the Loading Port. Any costs arising from delays in loading the vessel that are attributable to vessel's failure to comply with Buyer's warranty, as set forth herein, shall be for the account of the Buyer.

(c)   If a vessel nominated by the Buyer is rejected by the Seller, the Buyer shall promptly nominate another vessel to the Seller subject to the terms of this Article 7.

(d)   The Seller shall exercise due diligence to provide, or cause to be provided, free of charge, a berth or berths which the vessel can safely reach and leave and at which she can lie and load safely afloat. Notwithstanding anything contained in this or any other Article in this Contract to the contrary, the Seller shall not be deemed to warrant the safety of any such berth or berths and shall not be liable for any loss, damage, injury or delay resulting from any unsafe condition of such berth or berths which could have been avoided by the exercise of reasonable care on the part of the Buyer. The Buyer shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Seller for the purpose of loading Product; however, the Buyer shall be responsible for charges for such berth when used solely for vessel's purposes.

(e)   The Seller shall furnish, upon the Buyer's request, all readily available information concerning restrictions at the Loading Terminal with respect to maximum draft, length, deadweight, displacement, age, flag, and the like, Terminal Procedures relevant to vessel operations, and special or non-customary requirements of governmental authorities at the Loading Port. The Buyer shall in any event and in all circumstances be deemed to be fully familiar with such restrictions, Terminal Procedures, and requirements. The Buyer shall not nominate or provide a vessel which does not conform to the Loading Terminal restrictions, Terminal Procedures and requirements. The Buyer acknowledges that Terminal Procedures and regulations of governmental authorities with jurisdiction over the Loading Port apply to the loading and receipt of the Product and to the Buyer's vessels thereat. If the Buyer's vessel does not conform to the Terminal Procedures, or to the requirements or

regulations of governmental authorities or the Seller's reasonable standards on safety, size, age of the vessel, crewing, and operations, the Seller may refuse to berth or load the vessel, and any delays or expenses of the Seller and the Buyer due to such non-conformance (whether the Seller so refuses or proceeds with berthing or loading) shall be for the Buyer's account.

Despite any prior acceptance, the Seller shall have the right to reject the vessel nomination at any time after the Seller's initial acceptance if receipt of legitimate information demonstrable to a court of competent jurisdiction results in the vessel no longer conforming to reasonable standards on safety, environmental protection, size, navigation, crewing, and operations, provided such vessel rejection is not asserted for the purpose of commercial gain.

(f)    Accepted Date Range and vessel nomination procedures shall be promptly established to conform with Loading Terminal Procedures, as follows:

    (1)    The Buyer shall propose to the Seller date range(s) for tendering NOR (as defined in Article 8(b)) and shall also specify the approximate amount of Product to be loaded (subject to a variation of plus or minus five percent (+/-5%) at the Buyer's option) and the name of the vessel (or that it is a "to be named" vessel ("TBN")).

    (2)    If the Seller accepts the Buyer's proposed date range(s), they shall become the Accepted Date Range(s).  If the Seller rejects the Buyer's proposed date ranges, the Seller shall propose the minimum modifications to the Buyer's requests required to accommodate the Seller's or the Seller's supplier's and the Loading Terminal's schedules.  The Parties shall consult to agree on a mutually acceptable schedule of loadings and Accepted Date Range(s).

    (3)    If the Parties fail to agree, the Seller shall be entitled (using its reasonable discretion) to establish, upon notice to the Buyer, the necessary date range(s) for shipments hereunder, which shall be deemed to be the Accepted Date Range(s).

    (4)    No stipulation as to time of delivery, whether as to the Accepted Date Range established pursuant to Article 7(f)(2) or any other period specified in the Special Terms, shall form part of the description of the Product deliverable hereunder.  For the avoidance of doubt, except as set forth in this Article 7(f)(4), any breach of such a provision would not enable the Buyer to reject, or Seller to refuse to deliver, the cargo of Product.  Notwithstanding the immediately preceding sentence, and except in cases of Force Majeure, as defined in Article 9: (i) Buyer may cancel delivery of Product for the Seller's failure to deliver if the Buyer's vessel has tendered NOR and is awaiting delivery of Product and the Seller fails to deliver the cargo within ten (10) days after the end of the Accepted Date Range or ten (10) days after the vessel has tendered NOR, whichever is later; and (ii) Seller may cancel delivery of Product if Buyer's vessel fails to tender NOR within ten days after the end of the Accepted Date Range.  Any cancellation permitted by this Article 7(f)(4) will only be valid if the cancelling Party provides written notice of cancellation to the other Party.  Any Party that properly exercises its right of cancellation under this Article 7(f)(4) may do so without prejudice to any other right or remedy that it may assert against the non-performing Party.

    (5)    In the event of any delay of any kind or from any cause whatsoever and provided always that the vessel is eventually loaded, any rights of the Buyer against the Seller, however the same may arise and whether or not arising under this Contract, shall be limited to any claim for the payment of demurrage as specified in Article 8.

(g)    Not later than ten (10) days prior to the first day of each Accepted Date Range, the Buyer shall (1) notify the Seller of the expected date of arrival of the vessel scheduled to receive the Product, and (2) provide written instructions regarding the making up and disposition of Bills of Lading and naming the destination ports of

discharge, which, if reasonable, shall be accepted by the Seller (subject to the terms of any relevant letter of credit). The Buyer shall notify the Seller of the name of any vessel previously advised as a TBN as soon as possible but in no event later than: (i) five (5) days before the start of the Accepted Date Range, or (ii) the last day for the naming of a vessel under Terminal Procedures, whichever is earlier.  The Buyer may thereafter substitute another vessel of similar class, type, size, capacity and position, provided all other provisions hereof are complied with and further provided that the substitution when advised is permitted under Terminal Procedures.

(h)     Vessel shall vacate berth as soon as loading is completed, subject to considerations of safety.  Any direct loss or damage incurred by the Seller as a result of vessel's failure to vacate berth promptly, including such as may be incurred due to resulting delay in docking the next vessel awaiting turn to load or discharge at such berth, shall be paid by the Buyer to the Seller.

## Article 8– Arrival, Laytime and Demurrage

(a)     VESSEL ARRIVAL NOTICES
The Buyer or the vessel's master or vessel's agent shall notify the Seller and the terminal operator at the Loading Port of the expected hour of arrival of the nominated vessel approximately seventy-two (72), forty-eight (48) and twenty-four (24) hours before arrival.

(b)     NOTICE OF READINESS
Upon arrival at customary anchorage or waiting place, vessel's master or vessel's agent shall give the Seller or its representative notice of readiness ("NOR") by letter, electronic mail, telex, facsimile, radio, or telephone (if radio or telephone, subsequently confirmed promptly in writing) that vessel is in all respects ready to load cargo .

(c)     COMMENCEMENT OF LAYTIME OR DEMURRAGE
If vessel arrives during the Accepted Date Range, laytime or time on demurrage shall commence upon arrival in berth or when six (6) hours have expired following the tendering of NOR, whichever occurs first. Arrival in berth shall mean the completion of mooring of vessel when loading at a sea terminal, vessel being all fast when loading alongside a berth, or vessel being all fast alongside the first loading barge, lighter or other vessel. If the vessel arrives before the first day of the Accepted Date Range and tenders NOR before said date, laytime or time on demurrage shall commence at 0600 hours local time on the first day of the Accepted Date Range or upon arrival in berth, whichever occurs first. In all other cases, laytime or time on demurrage shall commence upon arrival in berth.

(d)     DURATION
Laytime or, if vessel is on demurrage, time on demurrage, shall continue until all cargo hoses have been completely disconnected upon the final termination of the loading operation. Disconnection of all cargo hoses shall be promptly effected. If vessel is delayed in excess of two (2) hours after such disconnection of cargo hoses solely for the Seller's purpose, laytime or, if vessel is on demurrage, time on demurrage shall resume upon the expiration of said two (2) hour period and shall continue from that point until the termination of such delay.

(e)     ALLOWED LAYTIME
The Seller shall be allowed thirty-six (36) hours as laytime within which to complete loading Product onto the Buyer's vessel.

(f)     LAYTIME AND DEMURRAGE EXCLUSIONS
Time consumed due to any of the following events shall not count as laytime, or if vessel is on demurrage, as demurrage:

May 5, 2006                                      7

(1)    Due to a labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, officers or crew of vessel or tugboats or pilots;

(2)    Due to overflow, breakdown, inefficiency, repairs, or any other conditions whatsoever attributable to vessel, including inability to load the cargo within the time allowed and/or failure to meet vessel warranties stipulated in Article 7;

(3)    In ballasting or deballasting, lining up and/or draining of pumps and/or pipelines, cleaning of tanks, pumps, pipelines, bunkering or for any other purposes of the vessel only, unless same is carried out concurrent with loading so that no loss of time is involved;

(4)    Due to an escape or discharge of Product or the threat of an escape or discharge of Product on or from vessel. (The phrase "threat of an escape or discharge of Product" shall for the purposes of this Paragraph mean a grave and imminent danger of the escape or discharge of Product which, if it occurred, would create a serious danger of pollution damage);

(5)    On an inward passage, including, but not limited to, awaiting daylight, tide, tugs or pilot, and moving from anchorage or other waiting place, even if lightering has taken place at the anchorage or other waiting place, until vessel's arrival in berth;

(6)    Due to port authority prohibiting loading, or vessel refusing to load; or

(7)    By reason of local law or regulations, action or inaction by local authorities (including, but not limited to, Coast Guard, Naval, Customs, Immigration or Health authorities), with the exception, however, of port closure due to weather and/or sea conditions.

(g)    **DEMURRAGE**

(1)    The Seller shall be liable for demurrage costs for time on demurrage to the extent that the time period between commencement and termination of laytime, or if vessel is on demurrage, time on demurrage less any exclusions, as defined in Article 8(f), exceeds the allowed laytime provided for in this Contract. Except as provided in Article 8(h), the Seller's liability for demurrage shall be absolute and shall not, in any case, be subject to the provisions of Article 9. The appropriate rate of demurrage to be paid by the Seller shall be:

(i)    the rate, if any, specified in the Special Terms; or if such rate is not specified

(ii)    the applicable charter party rate.

(2)    Absent such rates, the demurrage rate shall be determined by using the Worldscale base demurrage rate for a vessel of the same type and carrying capacity, carrying the same category of Product, adjusted by applying as a percentage, the Worldscale AFRA Monthly Assessment rate for the month of loading as determined by the Bill of Lading date. Should the Buyer present a performing vessel with a capacity significantly greater than the cargo tonnage agreed demurrage will be calculated at the Worldscale rate corresponding to the said tonnage agreed plus five percent (+5%) constant for fuels. Such base demurrage rate shall be adjusted by applying as a percentage, the Worldscale AFRA Monthly Assessment rate for the month of loading as determined by the Bill of Lading date.

(h)    HALF RATE DEMURRAGE

If demurrage is incurred and the vessel has been delayed in berthing or loading (hereinafter in this Paragraph called "Delay") due to: weather and/or sea conditions; fire; explosion; strike, picketing, lockout, slowdown, stoppage or restraint of labor; or breakdown of machinery or equipment, in or about the facilities of the Loading Terminal, (hereinafter separately and jointly called "Listed Conditions"), be the Delay prior to or after the

expiration of laytime, that span of time on demurrage equal to the period or periods of Delay as described shall be paid at half of the demurrage rate. If, during a period of Delay, Listed Conditions co-existed, along with any other conditions that would otherwise count as laytime or if the vessel is on demurrage, as demurrage, the Listed Conditions shall conclusively be deemed to be sole cause of the Delay, either if they caused the Delay independently of the other conditions or could have caused the Delay if the other conditions had not so co-existed. Weather and/or sea conditions shall include, but not be limited to, lightning, restricted visibility (the term "restricted visibility" shall mean any condition in which visibility is restricted by fog, mist, falling snow, heavy rainstorms, sandstorms and any other similar causes), storm, wind, waves and/or swells.

(i)   VESSEL SHIFTING
Seller shall have the right to shift Buyer's vessel from one berth to another, subject to Seller's payment of all towage and pilotage charges for shifting to next berth, charges for running lines on arrival at and leaving that berth, wharfage and dockage charges at that berth, additional agency charges and expenses, Customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth, except as hereinafter provided, and time consumed on account of shifting shall count as used laytime (or time on demurrage). If it is necessary to shift the vessel off the berth because of breakdown of machinery or other deficiency of the vessel or its crew, the resulting expenses shall be for the vessel's account, the time consumed shall not count as used laytime (or time on demurrage), and the vessel shall lose its regular turn in berth. When the vessel is ready to continue loading, it shall so advise and await its turn to load in accordance with Terminal Procedures, and laytime (or time on demurrage) shall recommence when the vessel is all fast.

(j)   DEMURRAGE CLAIMS
Any demurrage claim under this Contract is conditional on notice being given to the Seller in writing, with all supporting documentation (including but not limited to the notice of readiness, statement of facts, relevant notes of protest and charter party recapitulation telex), within ninety (90) days after completion of loading, failing which the Buyer is deemed to have waived the claim. Demurrage for which the Seller is liable shall be paid promptly.

(k)   DEMURRAGE LIABILITY LIMITATION
Notwithstanding the provisions of Articles 8(g) and 8(h) of this Agreement, the Seller's liability for demurrage under this Agreement will not exceed the amount of demurrage actually paid to the vessel.

**Article 9 – Force Majeure and Exceptions**

(a)   Force Majeure is an occurrence beyond the control and without the fault or negligence of the Party affected and which said Party is unable to prevent or provide against by the exercise of reasonable diligence. Force Majeure includes, but is not limited to compliance with legislation, acts, rules, orders, regulations, directives or requests of any federal, state, local, or military authority, or by any authority created by or pursuant to government act (such as the International Energy Agency), or by any person purporting to act therefor, or insurrections, wars, rebellions, riots, embargoes, strikes or other labor difficulties, fires, explosions, floods, or actions of the elements, acts of God, disruption or breakdown of production, loading or transportation facilities (including any failure or delay by a third party carrier to accept Product or effectuate delivery). Except for the obligation to pay demurrage at half the demurrage rate in accordance with Article 8(h), as applicable, neither Party shall be liable for loss or damage, including indirect or consequential damages, or for prospective loss of profits, breach, delay or non-performance to the extent that such loss, damage, failure or delay is caused by an event of Force Majeure.

(b)   If, for any reason beyond the control of the Seller, the Seller is unable to obtain sufficient quantities of Product at the Loading Terminal, and, as a result, the Seller is unable to fulfill its obligations, the Seller shall be entitled to allocate its available supplies of Product at the Loading Terminal in its absolute discretion.

May 5, 2006                              9

(c)     The Seller shall not be obliged to purchase additional supplies of Product or to make up deliveries omitted during the period of disruption, nor shall the term of this Contract be extended due to the causes set forth above.

(d)     A Party affected by events described in Article 9(a) or 9(b) shall give prompt notice to the other Party, describing in sufficient detail the events and the estimated scope of disability. In the event of a material delay caused by events in Article 9(a), either Party shall be entitled to terminate this Contract with regard to deliveries of Product which have not yet been loaded by giving the other Party notice of termination within two days of receipt of notice of delay. In the event of an allocation of Product described in Article 9(b), Buyer shall be entitled to cancel the cargo of Product by giving the Seller notice of cancellation within two days of receipt of the notice of allocation.

(e)     Notwithstanding the foregoing, any Party, which is a government oil company or other agency or entity controlled by the government, shall not be entitled to invoke any action, order, decree, rule, regulation, or directive of such government as Force Majeure in order to relieve itself of any obligation under this Contract.

(f)     Nothing contained in this Article 9 shall: (i) relieve the Buyer of its obligations to pay for Product delivered by the Seller, or (ii) affect the rights and liabilities of the Buyer and the Seller with respect to laytime and demurrage described in Article 8.

**Article 10 – Governing Law and Submission to Jurisdiction**

(a)     The Contract shall be construed and interpreted under the laws of the State of New York without regard to its conflicts of law principles.

(b)     Except as otherwise provided herein, each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or, if such court does not have jurisdiction or shall not accept jurisdiction, to any court of general jurisdiction in and for the County of New York in the State of New York for the resolution and determination of any dispute between the Parties relating to the construction, meaning or effect of this Contract, or the rights and liabilities of the Parties hereunder, or any matter arising therefrom or connected therewith. Each of the Parties hereby irrevocably waives actual personal service of process in connection with any action initiated in any court to whose jurisdiction the Parties have by contract submitted, and agrees to accept, in lieu of such personal service, written notice of such action given by hand delivery or by certified or registered pre-paid mail (provided that notice shall also be given by telex, facsimile, or other written communication that such mailed notice has been sent, no later than the second day following the date of mailing) to its address as set out in the Special Terms or otherwise notified pursuant to this Contract, or to its principal place of business, and addressed to the Party in question, provided that either Party may cause service of process to be effected in any other lawful manner rather than by use of the aforesaid procedure.

(c)     Neither Party shall be precluded from pursuing arrest, attachment and/or conservatory, interlocutory or interim actions in any court or in any jurisdiction.

(d)     The United Nations Convention on Contracts for the International Sale of Goods 1980 shall not apply to this Contract.

(e)     The latest edition of Incoterms shall apply to this Contract. In the event of any conflict between the latest edition of Incoterms and this Contract, the terms of this Contract shall prevail.

(f)     Each Party hereto warrants that it has entered into this Contract in a commercial capacity.  To the extent the Buyer or Seller has or may acquire any immunity from jurisdiction for themselves or their property in any court/arbitration proceeding relating to this Contract, the Buyer or Seller irrevocably waives such immunity with respect to its obligations under this Contract and agrees that it shall not raise the defense of sovereign immunity. This waiver and agreement are intended to be effective in any jurisdiction in which any such

court/arbitration proceeding under this Contract may be commenced. This waiver and agreement is not effective with respect to any person other than the Parties and their successors and permitted assignees acting under the specific circumstances contemplated in this Article.

(g)    Should any provisions hereof be finally determined to be inconsistent with or contrary to applicable law, such provisions shall be deemed amended or omitted to conform therewith without affecting any other provisions or the validity of this Contract.

## Article 11 – New or Changed Regulations

The Seller and the Buyer enter this Contract relying upon (1) the laws and regulations in effect on the effective date of this Contract, and (2) agreements, arrangements and concessions entered into with the government, agencies or governmental instrumentalities in effect on such date (collectively referred to as "Regulations"). If at any time during the term of this Contract, any Regulations are changed and the change has a material adverse economic effect on the Seller or the Buyer under this Contract and such change is not addressed by any other provision of this Contract, then either Party at its option may provide written notice to the other Party of adjusted Contract terms to reflect the change(s), listing the reason(s) for such change(s). If the Parties fail to agree to new terms within fifteen (15) days of the notice, either Party may terminate the Contract without liability. Any deliveries made during the fifteen (15) day period shall be at the originally agreed terms and price adjusted to include the increase under this Article.

## Article 12 – Termination

Seller or Buyer shall have the right to terminate this Contract in the event of a material breach (including, without limitation, anticipatory breach) by the other Party of any of its terms, but without prejudice to the rights of either party accrued under this Contract (including without limitation the right of either Party to damages arising from such breach or prior breaches hereof). Seller shall have the right to terminate this Contract if the Buyer fails to make payments as they fall due under the terms of the Contract.

## Article 13 – Limitation of Liability

**NEITHER PARTY SHALL BE LIABLE IN CONTRACT, TORT OR OTHERWISE, FOR LOSS OF PROSPECTIVE PROFITS OR FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES IN RELATION TO PERFORMANCE OR NON-PERFORMANCE UNDER THIS CONTRACT.**

## Article 14 – Waiver

The delay or failure on the part of either Party to insist, in any one instance or more, upon strict performance of any of the terms or conditions of this Contract, or to exercise any right or privilege herein conferred shall not be construed as a waiver of any such terms, conditions, rights or privileges, but the same shall continue and remain in full force and effect. All rights and remedies are cumulative.

## Article 15 – Assignment

The ExxonMobil Party may, upon written notice to the other Party but without its consent, assign all or any portion of its rights and benefits hereunder or transfer all or any portion of its obligations hereunder to an Affiliate. The Affiliate receiving such an assignment or transfer shall thereafter be solely liable for the performance of the obligations hereunder. When requested by the ExxonMobil Party, the other Party shall promptly execute any and all documentation required by the ExxonMobil Party to perfect a novation of the Contract under the applicable law.

Except for the foregoing, this Contract shall not be assigned in whole or in part by either Party without the written consent of the other Party, such consent not to be unreasonably withheld. Further, unless otherwise provided in

May 5, 2006                                                11

such consent, the assignor shall be jointly and severally held responsible with the assignee for the full performance of the assignor's obligations towards the other Party.

## Article 16 - Amendments

All amendments, modifications or waivers of this Contract shall be effected or become effective only in a writing signed by the Parties or by an exchange of emails or facsimiles wherein both Parties agree to the amendment, modification or waiver.

## Article 17 – Entire Agreement

This Contract sets forth the entire understanding and agreement between the Parties as to matters covered herein and supersedes any prior understanding, agreement, or statement (written or oral) of intent among the Parties with respect to the subject matter hereof.

## Article 18 – Third Party Rights

This Contract is for the sole benefit of the Parties hereto and their successors and permitted assigns and nothing herein express or implied shall give or be construed to give to any person, other than the Parties hereto and such successors and permitted assigns, any legal or equitable rights hereunder.

## Article 19 - United States Laws

Notwithstanding any other provision in this agreement or any other document, neither this Contract nor any other document shall constitute an agreement by either Party to take any action or refrain from taking any action that is in conflict with, penalized under, or compliance with which is prohibited by, United States laws or regulations.

## Article 20 – Notices

All notices, requests, demands and other communications that are required or may be given under this Contract shall be in writing and shall be deemed to have been duly given:  (a) when received, if personally delivered; (b) when transmitted, if transmitted by telex, facsimile or electronic mail, subject to the sender's  machine receiving the correct answerback of the addressee or confirmation of uninterrupted transmission by a transmission report or the recipient confirming by telephone to the sender that the recipient has received the message; and (c) upon receipt, if sent by certified or registered mail, return receipt requested or if sent by a recognized overnight delivery service; provided, that a notice given in accordance with this Article but received on a non-working day or after business hours in the place of receipt shall be deemed to be given on the next working day in that place.  In each case notice shall be sent to the exact corresponding address set out in the Special Terms, unless changed by further notice given pursuant to this Article 20.  In any case in which a Party is required or permitted to respond to a notice hereunder within a specified period, such period shall run from the date on which the notice was deemed received as above provided, and the response shall be considered timely given if deemed given as above provided by the last day of such period.

**Appendix 1.     CUSTODY TRANSFER DETAILS**

**Quantity Units, Measurement and Sampling**

1.        Quantity Units to be used are:

    (a)        Total Calculated Volume - Total Calculated Barrels (and/or cubic meters where indicated by local custom) measured at Sixty Degrees Fahrenheit (60 Deg F.) or Barrels (and/or cubic meters where indicated by local custom) at Fifteen Degrees Centigrade (15 Deg C.) as otherwise defined in API's Manual of Petroleum Measurement Standards (MPMS) Chapter 1, with all corrections for temperature based on ASTM D1250-80 or equivalent tables; and

    (b)        Weight - Metric tonnes and long tons, with all weights expressed "in air" and "in vacuum" in accordance with ASTM-IP Petroleum Measurement Tables (IP200 or equivalent).

2.        Measurement Procedures to determine quantity shall be performed subject to Terminal Procedures in the following order of preference:

    (a)        Meter readings, in accordance with API MPMS Chapter 5, with meters proved according to API MPMS Chapter 4; or

    (b)        Manual, or Verifiable Automatic, shore tank measurements in accordance with API MPMS Chapter 3; or

    (c)        Vessel Ullage adjusted for the vessel's load port experience factor calculated in accordance with API MPMS Chapter 17.

3.        Sampling Procedures for the determination of quality shall be performed subject to Terminal Procedures in the following order of preference:

    (a)        Automatic, Flow-proportional, In-line Device in accordance with API MPMS Chapter 8.2; or

    (b)        Weighted, Volumetric Composite of representative samples taken manually from the Seller's or the Seller's supplier's tanks prior to loading in accordance with API MPMS Chapters 8.1 and 17; or

    (c)        Weighted, Volumetric Composite of representative samples taken manually from the Buyer's vessel's Tanks, in accordance with API MPMS Chapters 8.1 and 17.

4.        Sample Retention - The Seller shall arrange for samples obtained in accordance with Clause 3 above, to be retained at the Loading Port for at least ninety (90) days from Bill of Lading date of the Product.



## CERTIFICATE OF ANALYSIS

| | | | |
|---|---|---|---|
| REFERENCE: | Buff 301 | REF.#: | RMG011313-G-3 |
| LOCATION: | GTI, Galveston | FILE: | 50-13-00026 |
| PRODUCT: | Bunker Fuel | DATE: | 1/15/2013 |
| MOVEMENT: | After Loading | LABID#: | TC0026-1 |

The following analytical results were obtained from composited samples drawn from the Buff 301.

| PRODUCT PROPERTY | METHOD | SPECIFICATIONS | RESULTS |
|---|---|---|---|
| Api Gravity @ 60 Deg F | D-4052 | Report | 11.4 |
| Viscosity @ 50 Deg C | D-445 | 380 Max | 372.5 |
| Density @ 15 Deg C, kg/m3 | D-4052 | 991 Max | 989.6 |
| CCAI | Calculation | 870 Max | 850.7 |
| Sulfur, Wt % | D-4294 | 3.5 Max | 3.32 |
| Flash Point, Deg C | D-93 | 60 Min | 89 |
| Flash Point, Deg F | D-93 | 140 Min | 192 |
| H2S in Vapor, mg/kg | D-5705 | 10 Max | < 5 |
| Hydrogen Sulfide, mg/kg | UOP-163 | 2.00 Max | < 1 |
| Acid Number, mg KOH/g | D-664 | 2.5 Max | 0.11 |
| Strong Acid Number, mg KOH/g | D-664 | Report | < 0.05 |
| Total Sediment, Wt % | D-4870B | 0.1 Max | 0.03 |
| Micro Carbon Residue, Wt % | D-4530 | 18.0 Max | 15.9 |
| Pour Point, Deg C | D-97 | 30 Max | -9 |
| Pour Point, Deg F | D-97 | 86 Max | 16 |
| Water Content, Vol % | D-95 | 0.5 Max | < 0.05 |
| Ash Content, Wt % | D-482 | 0.10 Max | 0.0471 |
| **Metals:** | | | |
| Vanadium, mg/kg | IP-470 | 350 Max | 120 |
| Sodium, mg/kg | IP-470 | 100 Max | 11 |
| Aluminum, mg/kg | IP-470 | AL+ Si 60 Max | 11 |
| Silicon, mg/kg | IP-470 | AL+ Si 60 Max | 15 |
| Calcium, mg/kg | IP-470 | 30 Max | 8 |
| Zinc, mg/kg | IP-470 | 15 Max | 1 |
| Phosphorus, mg/kg | IP-501 | 15 Max | < 1 |

### RESULTS ARE VALID "AS AT" DATE AND LOCATION LISTED
Samples are retained for a period of 30 days unless otherwise requested in writing

Chris Miller
Laboratory Manager



1